Paul R. Smith (14325)
Elena T. Vetter (17337)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801-536-6130
Fax: 801-536-6100
psmith@parsonsbehle.com
evetter@parsonsbehle.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JARED PRESLAR, an individual;<br><br>Plaintiff,<br>vs.<br><br>NXTLVL SERVICES, LLC, a Florida Limited Liability Company, and ONE UP SERVICES, LLC, a Florida Liability Company;<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Civil No. _____<br><br>Judge _____ |

Plaintiff Jared Preslar complains of Defendants NXTLVL Services, LLC, and One Up Services, LLC (collectively, "Defendants"), and alleges as follows:

## PARTIES

1.      Plaintiff Preslar is an individual living in Layton, Utah.

2.      Defendant NXTLVL Services, LLC is a limited liability company organized and existing under the laws of the State of Florida.

3.      Defendant One Up Services, LLC likewise is a limited liability company organized and existing under the laws of the State of Florida.

## PERSONAL JURISDICTION

4.      As detailed below, Defendants have transacted business within this judicial district.

5.      Defendants maintain websites and online presences, and thereby offer their services for sale, throughout the United States.

6.      On information and belief, Defendants also circulate promotional emails to individuals located throughout the United States, including Plaintiff Preslar.

7.      With regards to their contracts with Preslar, Defendants' business was purposefully directed to Utah.

8.      Defendants sent promotional materials to Preslar, sought him out as a customer, and conducted business with him, all while Preslar was a Utah resident.

9.      The parties' agreements, which were negotiated and executed (at least in part) in the State of Utah, concerned Defendants' rendering of services for Preslar's business ventures. Preslar's business ventures are also based out of Utah.

10.     Because Preslar's claims arise from the business Defendants conducted within this state, Defendants are subject to the jurisdiction of this Court, pursuant to Utah Code Ann. § 78B-3-205 and Rule 4(k)(1) of the Federal Rules of Civil Procedure.

## SUBJECT MATTER JURISDICTION

**A.  Federal Question Jurisdiction**

11.     One of the claims asserted herein arises under section 43 of the Lanham Act, a federal statute. *See* 15 U.S.C.A. § 1125.

2

12.     As detailed below, Defendants' promotional materials make false claims. Their advertising is neither truthful nor accurate.

13.     That false advertising violates the unfair competition provisions of the Lanham Act, 15 U.S.C.A. § 1125 *et seq.*

14.     Accordingly, this Court has federal question jurisdiction over this case, pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201.

**B.  Diversity Jurisdiction**

15.     This Court may also exercise diversity jurisdiction in this case, as the parties are completely diverse and the amount in controversy is met.

16.     Plaintiff Preslar is an individual residing in the State of Utah.

17.     Defendants are limited liability companies organized and existing under the laws of the State of Florida.[1]

18.     Defendants' actions have damaged Preslar in an amount to be determined at trial. Preslar affirmatively alleges that his damages in this matter exceed $400,000.

19.     Accordingly, because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, this Court has diversity jurisdiction over this case, pursuant to 28 U.S.C. § 1332.

<u>**VENUE**</u>

20.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1400(a).

---

[1] Defendants' members are, likewise, completely diverse from Preslar.

3

21.    As detailed below, Defendants conducted business in the State of Utah in the context of doing business with Preslar.

22.    Venue is proper because Defendants' affirmative contacts with the State of Utah—including, but not limited to, negotiating and executing their contracts with a Utah resident, for services to be rendered for businesses located in Utah—led to the claims at issue in this suit.

## GENERAL ALLEGATIONS

### A.  The Parties and Their Businesses

23.    Plaintiff Preslar is an individual with a number of online storefronts, including storefronts through Amazon, Walmart, and various other online retailers.

24.    As an e-commerce vendor, Preslar sells products directly to consumers. Consumers access those products via storefronts run through platforms provided by companies such as Amazon and Walmart.

25.    Defendants NXTLVL Services, LLC and One Up Services, LLC purport to be e-commerce consultants.

26.    Defendants advertise services to help e-commerce vendors manage, promote, operate, and grow their e-commerce storefronts.

27.    That is, they promise to operate and manage all aspects of online storefronts, including the day-to-day operations from selling to shipping, and the compliance aspects involved with operating on various online platforms.

28.    Their promotional materials promise, for example, to assist individuals with "generat[ing] passive income with [their] own Amazon / Walmart store." They claim to help "people who don't have the time to do it on their own" or "simply just don't know how to get

4

started" in the online retail space, and declare that "clients that have trusted [NXTLVL] to build their own store . . . now [] sit back, relax and let NXTLVL Services / OneUp Services do all the work for them."

29.     From January through October 2021, the NXTLV Services, Inc. website read: "We take the guess work out of starting your own business. We take care of everything for you, from A to Z. We put in the work, you get paid." In addition, it advertised that the company provided "a unique and rare opportunity to own a business without having to work in that business" which would be "hands off for [the customer], allowing [the customer] to earn great income on autopilot."[2]

30.     Their newsletters further allege that they are a "leader in the industry" and that their aim is to "provide quality service" to their customers.

31.     Defendants therefore hold themselves out as experts in the field of e-commerce consulting, and market and offer their services in the context of this supposed expertise.

32.     On two separate occasions, Preslar engaged Defendants to provide the consulting services they advertise, and to operate, manage, and grow his online storefronts.

---

[2] This text has been pulled from website captures archived by the Wayback Machine, an online archive. The Wayback Machine's archives show captures of the NXTLVL Services, Inc. website for the following dates in 2021, each of which include the above-quoted text: January 20, February 23, March 2, April 16, May 8, May 18, June 14, July 26, September 28, October 20. *See, e.g., NXTLVL Services – Fully Managed Amazon Businesses* (https://nxtlvlservices.com/: Jan. 20, 2021); archived at *Wayback Machine* (https://web.archive.org/) > https://nxtlvlservices.com > Jan. 20, 2021.

4888-9123-6663.v2

**B. The April 2021 Agreement**

33.    As an e-commerce vendor, Preslar desired to grow his businesses. After reading Defendants' promotional materials and consulting their resources, and after attending a presentation touting Defendants' performance metrics, Preslar decided to invest in the growth of his e-commerce outlets by engaging Defendants to manage and operate his storefronts.

34.    Accordingly, on April 16, 2021, Preslar and Defendants entered into an E-Commerce Consulting Agreement (the "April 2021 Agreement," attached hereto as Exhibit A).

35.    The April 2021 Agreement required Defendants to:

(A) Maintain [Preslar's] Store in accordance with prevailing commercial standards, including configuring the Walmart storefront and configuring the front and backend systems necessary to manage the Store.

(B) Review, research, source, select, and list products for [Preslar's] Store.

(C) Respond to customers' phone and email inquiries in support of [Preslar's] Store and [] exercise Good Faith Efforts to resolve as promptly as practicable customer inquiries, handle product returns, and manage billing matters.

(D) Maintain oversight of [Preslar's] Store and its financial performance . . . .

36.    In exchange, Preslar agreed to pay Defendants a non-refundable consulting fee of $25,000, as well as a maintenance fee of $300.00 per month, or fifty percent of the net profits from Preslar's store—whichever was greater, for every store he had Defendants manage.

37.    Defendants agreed to manage three stores under this arrangement. Accordingly, Preslar was required to pay $75,000 in consulting fees, and the applicable maintenance fees according to the agreement.

38.    The consulting fees were due to be paid over time. The first half of the fee for each location ($12,500) was due immediately. The second half of the fee for each location was due once the storefront was up and running, or "live."

6

39.     Preslar made all requisite payments under that payment schedule.

40.     On April 16, Preslar sent Defendants $37,500 via wire transfer. That sum represented half the consulting fees for the three stores the parties had agreed Defendants would manage.

41.     On July 16, once the first of the three stores was live, Preslar sent Defendants $12,500 (the remainder of the monies owed for the consulting fee on that store).

42.     Preslar also commenced paying the monthly $300 maintenance fee for the stores.

43.     Not long after the parties entered into this agreement and Defendants became responsible for those storefronts, however, the storefronts began suffering from issues caused by Defendants' failure to manage certain business aspects.

44.     For example, Defendants failed to ensure the storefronts were listed under proper owners, and that the storefronts qualified for proper certification and approval by Walmart.

45.     As a result, two of the three stores Preslar hoped Defendants would manage never got off the ground at all.

46.     Although Defendants had contracted to provide assistance with operation and management, as well as third-party compliance, they failed to ensure Preslar's storefronts were compliant.

47.     Because Defendants did not appropriately ensure the storefronts' compliance, pursuant to the parties' agreement, those storefronts became essentially non-operational, and Preslar began losing sales and income.

48.     As soon as Preslar became aware of this situation, he reached out to Defendants to remedy these issues, but Defendants were largely uncommunicative.

49.     Preslar reached out over email and phone on multiple occasions. But Defendants ignored his attempts to ask for their help to redress the situation they'd created.

50.     When they did eventually respond to Preslar's concerns, Defendants' lengthy delays had already substantially disrupted Preslar's online sales.

51.     Contrary to Defendants' promises, their services did not improve Preslar's online storefronts—they undermined them.

52.     Defendants ultimately sought to terminate this agreement, promising, instead, to enter into an agreement with Preslar to manage his Amazon storefront.

**C.  The October 2021 Agreement**

53.     Based on Defendants' assurances, Preslar entered into a second agreement with them (the "October 2021 Agreement," attached hereto as Exhibit B).

54.     The October 2021 Agreement required Defendants to:

(A) Maintain [Preslar's] Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.

(B) Review, research, source, select, and list products for [Preslar's] Store.

(C) Respond to customers' phone and email inquiries in support of [Preslar's] Store and . . . exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

(D) Maintain oversight of [Preslar's] Store and its financial performance . . . .

55.     Preslar was to continue paying his maintenance fee. He did so.

56.     But, once again, Defendants failed to uphold their end of the bargain.

57.     They failed to appropriately manage, promote, configure, and oversee Preslar's Amazon storefronts, breaching their contractual obligations and causing Preslar to suffer damages as a consequence.

58.     Prior to entering into the October 2021 Agreement, Preslar had already established, and was enjoying significant success managing, an Amazon storefront.

59.     That storefront brought in an average of $10,000 of revenue each month.

60.     Defendants assured Preslar they could increase his monthly Amazon revenue to at least $40,000.

61.     They then instructed him to open additional Amazon storefronts and utilize drop shipping in order to increase revenue and profits.

62.     Preslar expressed reservations about taking both of these actions. Preslar himself was aware of, and pointed Defendants to, Amazon's terms and conditions, which specifically limited vendors to one store per household and prohibited drop shipping.

63.     As with the parties' prior agreement, the October 2021 Agreement obligated Defendants to be knowledgeable about, to foresee, and to apply, third-party policies in a way that would expand and grow Preslar's business.

64.     Accordingly, Defendants should have known about these Amazon policies even without Preslar's invocation of them.

65.     When Preslar raised these policies, however, Defendants waved them away.

66.     In response to Preslar's concerns, Defendants told Preslar that there would not be any issues with utilizing drop shipping or opening additional storefronts, and assured him that—if there were any such problems—they'd take care of them.

67.     Pursuant to Defendants' instructions, Preslar opened those additional storefronts.

68.     Amazon promptly disabled not just his new storefronts, but the existing one.

4888-9123-6663.v2

69.     Therefore, Preslar lost the profits from his existing Amazon storefront, and Defendants failed to manage and operate his online businesses appropriately.

70.     Subsequently, despite their prior assurances, Defendants did not take care of the situation.

71.     Defendants did not intervene on Preslar's behalf to negotiate a resolution with Amazon.

72.     Defendants did not cause Preslar's Amazon storefront to be reinstated.

73.     Defendants did not bring Preslar's Amazon storefront into compliance or operate and manage it, as they'd contracted to do.

74.     Accordingly, Defendants did not uphold their duties under the October 2021 Agreement.

### FIRST CAUSE OF ACTION
**(Breach of the April 2021 Agreement)**

75.     Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows:

76.     The April 2021 Agreement required Defendants to:

(A) Maintain [Preslar's] Store in accordance with prevailing commercial standards, including configuring the Walmart storefront and configuring the front and backend systems necessary to manage the Store.

(B) Review, research, source, select, and list products for [Preslar's] Store.

(C) Respond to customers' phone and email inquiries in support of [Preslar's] Store and [] exercise Good Faith Efforts to resolve as promptly as practicable customer inquiries, handle product returns, and manage billing matters.

(D) Maintain oversight of [Preslar's] Store and its financial performance . . . .

10

77.     Preslar was required to pay a non-refundable consulting fee of $25,000, as well a maintenance fee of $300.00 per month, or fifty percent of the net profits from Preslar's store, on each store location Defendants managed for Preslar.

78.     Preslar made the required payments and upheld his duties under the April 2021 Agreement.

79.     Specifically, Preslar paid Defendants $50,000 in consulting fees, as well as additional sums for maintenance fees, pursuant to the April 2021 Agreement.

80.     Defendants, however, breached this contract.

81.     They did not maintain Preslar's store "in accordance with prevailing commercial standards," as they failed to ensure the storefronts were listed under proper owners, and similarly failed to ensure that the storefronts qualified for proper certification and approval by Walmart.

82.     Although Defendants had contracted to provide assistance with operation and management, as well as third-party compliance, they failed to ensure Preslar's storefronts were compliant, which made those storefronts essentially non-operational.

83.     Defendants likewise did not respond to Preslar's concerns promptly, and their lengthy delays substantially disrupted Preslar's online sales.

84.     Contrary to Defendants' promises, their services did not appropriately manage or improve Preslar's online storefronts—instead, they made them functionally non-operational.

85.     As a direct and proximate result of Defendants' material breaches of the April 2021 Agreement, Preslar was harmed and continues to suffer substantial harm. Preslar suffered actual and consequential damages in an amount to be determined at trial.

4888-9123-6663.v2

## SECOND CAUSE OF ACTION
### (Breach of the October 2021 Agreement)

86.     Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows:

87.     The October 2021 Agreement required Defendants to:

(A) Maintain [Preslar's] Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.

(B) Review, research, source, select, and list products for [Preslar's] Store.

(C) Respond to customers' phone and email inquiries in support of [Preslar's] Store and . . . exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

(D) Maintain oversight of [Preslar's] Store and its financial performance . . .

88.     Preslar upheld his obligations under this agreement.

89.     Defendants, however, did not. They did not "maintain" Preslar's store or "configur[e] the Amazon storefront" and "front and back end systems necessary to manage" it.

90.     Instead, they directed Preslar to take actions that led to Amazon's closure of his storefront, in direct contradiction to both Amazon's policies and Defendants' contractual obligations.

91.     At Defendants' insistence, and over his own protests and well-founded concerns, Preslar opened new storefronts on Amazon, which led to the closure of *all* his online storefronts on that platform.

92.     That closure damaged Preslar in numerous ways, including leading to the loss of the average $10,000 revenue each month of his original Amazon storefront, and the loss of the projected revenues—to the tune of at least $40,000 a month—Defendants promised Preslar if he followed their advice.

93.     As a direct and proximate result of Defendants' material breaches of the October 2021 Agreement, Preslar has been harmed and continues to suffer substantial harm. Preslar has suffered actual and consequential damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of the Covenant of Good Faith and Fair Dealing
Inherent in the April 2021 Agreement)**

94.     Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows:

95.     Inherent in the April 2021 Agreement is an obligation for both parties to act in good faith and deal fairly with one another.

96.     Defendants breached the covenant of good faith and fair dealing by failing to deliver the contracted-for services or respond in good faith to Preslar's requests for assistance and his ongoing attempts to communicate with them about their non-performance of the parties' Agreements.

97.     Defendants also breached the covenant of good faith and fair dealing by depriving Preslar of the anticipated fruits of the parties' agreements—namely, an increase in Preslar's revenue—instead causing Preslar's storefronts to be functionally non-operational and reducing Preslar's revenue to zero.

98.     By breaching the covenant, Defendants damaged Preslar in an amount to be proven at trial.

4888-9123-6663.v2

**FOURTH CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing**
**Inherent in the October 2021 Agreement)**

99.     Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows:

100.     Inherent in the October 2021 Agreement is an obligation for both parties to act in good faith and deal fairly with one another.

101.     Defendants breached the covenant of good faith and fair dealing by failing to deliver the contracted-for services or respond in good faith to Preslar's requests for assistance and his ongoing attempts to communicate with them about their non-performance of the parties' Agreements.

102.     Defendants also breached the covenant of good faith and fair dealing by depriving Preslar of the anticipated fruits of the parties' agreements—namely, an increase in Preslar's revenue—instead causing Preslar's storefronts to be functionally non-operational and reducing Preslar's revenue to zero.

103.     By breaching the covenant, Defendants damaged Preslar in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Tortious Interference with Prospective Economic Relations)**

104.     Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows:

105.     Defendants understood that Preslar is an e-commerce vendor, whose livelihood depends on the success of his online storefronts.

14

106.     Defendants knowingly made false statements in their promotional materials and in their communications with Preslar when they assured Preslar that they would run and manage his online storefronts effectively and profitably.

107.     Those false statements were material in Preslar's decision to engage Defendants and to enter into the agreements at issue.

108.     After assuring Preslar of their ability to run and manage his storefronts effectively and properly, Defendants then contracted with Preslar, allegedly to promote, operate, manage, and grow his online storefronts.

109.     Defendants failed to uphold their contractual obligations, however.

110.     Instead of running and managing Preslar's storefronts effectively or profitably, Defendants instead mismanaged those storefronts, neglected to ensure their compliance with mandatory policies, and ultimately led to the disabling of Preslar's Walmart storefronts and the outright cancellation of his Amazon storefronts.

111.     Defendants acted in direct contradiction to their promises and assurances and in direct contradiction of the policies of Walmart and Amazon.

112.     Defendants' actions were improper, and Defendants knew those actions—the neglect and mismanagement of Preslar's storefronts—were substantially likely to damage Preslar's relationships with Amazon, Walmart, and Preslar's existing and prospective customers.

113.     Indeed, after Defendants took responsibility for the promotion and operation of Preslar's online storefronts, and mismanaged them to the point of non-operation, Preslar ceased to have those avenues as available ways to reach new and existing customers.

114.    Preslar's relationships with existing customers—who had come to trust his storefronts—and potential customers—whom Defendants had assured Preslar were to follow, after the business growth they alleged they'd ensure—were damaged or lost.

115.    Preslar's relationship with Walmart and Amazon, his storefronts' hosts, were also damaged or lost due to Defendants' mismanagement of his storefronts.

116.    Accordingly, Defendants' actions caused Preslar to suffer harm and damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

117.    Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows:

118.    Pursuant to the parties' Agreements, Preslar paid Defendants the combined sum of $50,000 as a consultant fee.

119.    Defendants know of and have appreciated that financial benefit. They accepted and retained that benefit, even though they did not uphold their duties under the parties' Agreements.

120.    Under these circumstances, it is inequitable for Defendants to retain this benefit.

121.    As a direct and proximate result of Defendants' conduct, Preslar has been harmed and Defendants have been unjustly enriched.

122.    Preslar is thus entitled to restitution of the unjust enrichment obtained by the Defendants related to benefits conferred on the Defendants by Preslar, to the tune of $50,000.

4888-9123-6663.v2

## SEVENTH CAUSE OF ACTION
### (Unfair Competition Under Section 43 of the Lanham Act)

123.     Preslar realleges each of the foregoing allegations as if fully set forth herein and further alleges as follows.

124.     Defendants' promotional materials promise to assist individuals with "generat[ing] passive income with [their] own Amazon / Walmart store." Defendants' promotional materials further claim that their services "in regards to management/ operating" online storefronts are "for people who don't have the time to do it on their own" or "simply just don't know how to get started." Defendants promise that "clients that have trusted [Defendants] to build their own store . . . now [] sit back, relax and let NXTLVL Services / OneUp Services do all the work for them." This has not proven to be true.

125.     These untrue statements, and others like them, are made throughout Defendants' promotional materials.

126.     At the time the agreements at issue were entered into, the NXTLV Services, Inc. website read: "We take the guess work out of starting your own business. We take care of everything for you, from A to Z. We put in the work, you get paid." In addition, it advertised that the company provided "a unique and rare opportunity to own a business without having to work in that business" which would be "hands off for [the customer], allowing [the customer] to earn great income on autopilot."[3]

---

[3] *See, e.g., NXTLVL Services – Fully Managed Amazon Businesses* (https://nxtlvlservices.com/: Jan. 20, 2021); archived at *Wayback Machine* (https://web.archive.org/) > https.//nxtlvlservices.com > Jan. 20, 2021.

127.    These statements led Preslar to mistakenly believe that Defendants were offering services that they could not or would not—and ultimately, crucially, did not—follow through on: the effective management and operation of his online storefronts.

128.    In their promotional and advertising materials, Defendants made statements that materially misrepresented the nature, characteristics, and qualities of the commercial activities they offered.

129.    These misrepresentations misled Preslar.

130.    Moreover, because he believed the misinformation contained in these promotional materials, Preslar entered into agreements with Defendants, paid Defendants tens of thousands of dollars, and entrusted the management of his businesses and livelihood to Defendants.

131.    Defendants' misleading representations online and via email, through channels of commerce, therefore damaged Preslar in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Preslar prays as follows:

(a)    for general and specific damages in an amount to be proven at trial;

(b)    for compensatory damages to be proven at trial;

(c)    for punitive damages to be proven at trial;

(d)    for such other relief as this Court deems reasonable and just; and

(e)    for attorney fees and costs incurred in bringing this action.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 26th day of June, 2023.

PARSONS BEHLE & LATIMER

   /s/ *Paul R. Smith*
Paul R. Smith
Elena T. Vetter

*Attorneys for Plaintiff Jared Preslar*

4888-9123-6663.v2