Paul R. Smith (14325)
Elena T. Vetter (17337)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801-536-6130
Fax: 801-536-6100
psmith@parsonsbehle.com
evetter@parsonsbehle.com

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JARED PRESLAR, an individual;<br><br>       Plaintiff,<br>vs.<br><br>NXTLVL SERVICES, LLC, a Florida Limited Liability Company, and ONE UP SERVICES, LLC, a Florida Liability Company;<br><br>       Defendants. | **MOTION FOR DEFAULT JUDGMENT**<br><br>Civil No. 1:23-cv-00078<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Fed. R. Civ. P. 55(a) and DUCivR 55-1(a), Plaintiff Jared Presler hereby requests that the Clerk of the Court enter default against Defendants NXTLVL Services, LLC, and One Up Services, LLC, against whom a Default Certificate has already been entered under the Federal Rules of Civil Procedure, and the Local Rules of this Court.

This Motion for Default Judgment is supported by the attached declaration of Plaintiff Preslar, which attests to the amount due, as claimed in the Complaint, as well as other information required under DUCivR 55-1. That declaration is attached as Exhibit 1. The amount due against

these Defendants, as prayed for in the Complaint, is $1,490,000. Pursuant to the provisions of the agreements at issue, Preslar is also entitled to attorney fees, which are $15,022 to date. Additional interest, attorney fees, and costs may yet be accruing, and Preslar reserves the right to seek to augment the judgment to include these amounts at a later date.

Accordingly, Preslar requests that a Default Judgment be entered against the foregoing Defendants in the amount of $1,505,022, representing the sum of the two amounts above, to be entered jointly and severally. A declaration of counsel, establishing attorney fees, is attached hereto as Exhibit 2. A proposed form of judgment is also submitted herewith.

Dated: March 18, 2024

PARSONS BEHLE & LATIMER

   /s/ *Paul R. Smith*
Paul R. Smith
Elena T. Vetter

*Attorneys for Plaintiff Jared Preslar*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2024, I served the foregoing **MOTION FOR DEFAULT JUDGMENT** via the Court's electronic filing system on the Defendants in this case.

*/s/ Paul R. Smith*

3

# EXHIBIT 1

Paul R. Smith (14325)
Elena T. Vetter (17337)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801-536-6130
Fax: 801-536-6100
psmith@parsonsbehle.com
evetter@parsonsbehle.com

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| JARED PRESLAR, an individual;<br><br>   Plaintiff,<br>vs.<br><br>NXTLVL SERVICES, LLC, a Florida Limited Liability Company, and ONE UP SERVICES, LLC, a Florida Liability Company;<br><br>   Defendants. | **DECLARATION OF JARED PRESLAR**<br><br>Civil No. 1:23-cv-00078<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

---

I, Jared Preslar, declare and affirm as follows:

1. I am over the age of 18 and competent to testify as to the matters set forth herein.

2. The facts set forth herein are based upon my personal knowledge.

3. I am a Utah resident, and I own a number of online storefronts, including storefronts through Amazon, Walmart, and various other online retailers.

4. As an e-commerce vendor, I sell products directly to consumers. Consumers access the products I sell via storefronts run through platforms provided by companies such as Amazon and Walmart.

DocuSign Envelope ID: 7B9AA991-9957-46E7-9DD2-0D5B5539073D

5.      Defendants NXTLVL Services, LLC and One Up Services, LLC purport to be e-commerce consultants.

6.      In early 2021, I came across Defendants' advertisements, which advertised services to help e-commerce vendors manage, promote, operate, and grow their e-commerce storefronts.

7.      Defendants stated they operated and managed all aspects of online storefronts, including the day-to-day operations from selling to shipping, and the compliance aspects involved with operating on various online platforms.

8.      Their promotional materials promised to assist individuals like me with "generat[ing] passive income with [their] own Amazon / Walmart store" and claimed to help "people who don't have the time to do it on their own" or "simply just don't know how to get started" in the online retail space, and declared that "clients that have trusted [NXTLVL] to build their own store . . . now [] sit back, relax and let NXTLVL Services / OneUp Services do all the work for them."

9.      In reliance on these promotional materials and similar representations made to me by Defendants, I entered into two contracts with Defendants, both of which they breached.

10.      On April 16, 2021, I entered into an E-Commerce Consulting Agreement with Defendants (the "April Agreement," attached hereto as Exhibit A) to manage my Walmart storefronts.

11.      I made $50,000 in payments pursuant to the April Agreement.

12.      Defendants did not fulfill their obligations under the April Agreement, did not ensure my Walmart storefronts complied with Walmart's policies, and ultimately left my storefronts non-operational.

4878-7573-9042.v1

13.     In addition, Defendants led me to expect that each of my Walmart storefronts' profits would be $40,000 per month. However, Defendants' mismanagement of my storefronts did not lead to these profits—in fact, Defendants' mismanagement ran my storefronts into the ground. Defendants agreed to manage three stores under these conditions. Accordingly, I accrued additional damages of $720,000, which represents the loss for each of the months I expected a $40,000 profit from those storefronts but did not receive it, spanning from April through October.

14.     Defendants ultimately sought to terminate the April Agreement, promising, instead, to enter into an agreement to manage my Amazon storefront.

15.     Based on their continued assurances that they would manage my storefronts profitably, I entered into a second agreement with them (the "October Agreement," attached hereto as Exhibit B).

16.     Once again, Defendants failed to uphold their end of the bargain under this agreement.

17.     This time, Defendants instructed me to open a second Amazon storefront in violation of Amazon's policies. I protested, but Defendants assured me doing so would increase my Amazon sales volume. They promised that if I opened a second storefront, that store's profits would be $40,000 per month.

18.     Instead, Amazon disabled all my storefronts—both the existing one, that had been generating $10,000 in monthly income for me—and the new one I opened according to Defendants' instructions.

19.     Defendants never negotiated a resolution with Amazon that would bring my storefronts back online.

20.      As a result of Defendants' mismanagement of my Amazon storefront, in violation of their obligations under the October Agreement, I lost $240,000. I've calculated that number off the average value of sales I had from my existing Amazon storefront prior to Defendants' mismanagement of it, $10,000 per month, times the number of months Defendants' mismanagement of that storefront interrupted my online sales: 24 months (and counting).

21.      In addition, Defendants led me to expect that my second Amazon storefront's profit would be $40,000 per month. It was not. Accordingly, I accrued additional damages of $480,000, which represents an additional $40,000 loss for each of the months I expected those profits but did not receive them (twelve months, or one year—the term of the agreement).

22.      In sum, I have been damaged in an amount of $1,490,000, which is the sum of all the foregoing amounts.

23.      In addition, I have incurred attorney fees of $15,022.00 in pursuing this action.

24.      I have therefore been damaged by $1,505,022.00 in total.

25.      Both the April Agreement and the October Agreement provide fees to the prevailing party in any dispute.

26.      I hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

DATED:   3/2/2024 | 8:23 AM PST



_____

Jared Preslar

# EXHIBIT A

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of_____, 2021, by and between One Up Services, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and_____, whose address is _____(hereinafter "Client"). Capitalized terms used in this Agreement have the meanings given to such terms herein, including the definitions set forth in **Exhibit A** attached hereto.

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Walmart platform (the "Store"):

1.  **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):

    (A)     Maintain Client's Store in accordance with prevailing commercial standards, including configuring the Walmart storefront and configuring the front and backend systems necessary to manage the Store.

    (B)     Review, research, source, select, and list products for the Client's Store.

    (C)     Respond to customers' phone and email inquiries in support of Client's Store and shall exercise Good Faith Efforts to resolve as promptly as practicable customer inquiries, handle product returns, and manage billing matters.

    (D)     Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

2.  **CLIENT RESPONSIBILITIES.**

    (A)     Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

    (B)     Within the first eight (8) months of this Agreement, Client will use Good Faith Efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store or allow for a Suspension, such terms being defined or referenced on the Walmart website, in Exhibit A attached hereto, or other written materials provided to client throughout the Term of this Agreement; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.

    (B) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use Good Faith Efforts to assist Consultant in obtaining all information deemed reasonably necessary by Consultant to implement Consultant's Services.

3.  **COMPENSATION**. In consideration for this Agreement, Client shall pay Consultant the initial consulting fee of twenty-five thousand dollars ($25,000.00) USD (the "Fee"), split evenly into two payments via wire transfer

**Client Initials**_____.

ONE UP SERVICES, LLC © 2021

or ACH to Consultant's bank account. The first payment shall be made within 72 hours of execution of this Agreement and the second shall be made within 72 hours following the date when Client's store becomes active on the Walmart Marketplace. ***The Fee is non-refundable;*** except as provided in Section 10 herein below.

(A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant three hundred dollars ($300.00) USD per month (the "Maintenance Fee"), or fifty percent (50%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

(B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours from the receipt of Consultant's invoice to remit payment.

4.  **TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5.  **TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

6.  **NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7.  **SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8.  **INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Walmart, and Consultant holds no legal or equitable rights in Client's Store.

9.  **RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against

**Client Initials** _____.

Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

(A)      Non-Competition. Client on behalf of itself and its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions through Amazon or Walmart on behalf of third parties anywhere in the United States, regardless of where Client is physically located.

(B)      Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C)      Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as ""Disclosing Party," and the Party receiving the Confidential Information shall be referred to as ""Receiving Party."

(i)      Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)      If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D)      Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own Confidential Information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E)      Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)           In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints

**Client Initials**                .

ONE UP SERVICES, LLC © 2021

is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

**10. REPLACEMENT STORE.** If Client's Store is closed due to no fault of Client, Consultant agrees to manage and provide Services for a Replacement Store(s) for Client to the terms of this Agreement. until terminated pursuant to Section 5.

**11. LIMITATION OF LIABILITY**

(A) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, UNDER NO CIRCUMSTANCES, WILL EITHER PARTY, OR ANY OFFICERS, DIRECTORS,EMPLOYEES, AGENTS OR REPRESENTATIVES OF EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOTSUCH PARTY HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT EITHER PARTY'S RIGHTS TO FILESUIT AGAINST A THIRD PARTY OR

(B) PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, BOTH PARTIES HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF THE OTHER PARTY'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT THE OTHER PARTY'S PRIOR WRITTEN APPROVAL.

(C) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY WALMART OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(D) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

**12. DISCLAIMERS AND RELEASE**

EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEEMENT (INCLUDING, WITHOUT LIMITATAION, SECTION 13 AND THE SERVICES STANDARDS SET FORTH IN SECTION 1), CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE

Client Initials _____.

ONE UP SERVICES, LLC © 2021

OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

(A)　　　Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

(B)　　　Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Store.

Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to entering this Agreement.

(C)　　　Walmart Terms and Conditions – Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Store is suspended, Consultant will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies and any publicly available amendments thereto.

**13. REPRESENTATIONS AND WARRANTIES.** Both Parties mutually represent and warrant to the other Party that:

(A)　　　It has the right to enter into this Agreement, to grant the rights granted herein, and to perform fully

Client Initials _____.

ONE UP SERVICES, LLC © 2021

all of its obligations in this Agreement;

(B)        Its entering into this Agreement with the other Party and its performance of the terms do not and will notconflict with or result in any breach or default under any other agreement to which it is subject;

(C)        It has the required skill, experience, and qualifications to perform the Services, and shall perform the Services in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services, and it shall devote sufficient resources to ensure that the Services are performedin a timely and reliable manner;

(D)        It shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services;

(E)        Parties agree that any and all strikethrough (ex. ~~Strikethrough~~) of text does not invalidate or remove the validity or enforceability of the subject text and shall be read and interpreted into this Agreement as if the Strikethrough was not present.

## 14. GENERAL PROVISIONS

(A)        Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

(B)        Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its Services for and on behalf of Client as an independent contractor and not as Client's agent or employee.  There is no third-party beneficiary to this Agreement.

(C)        Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@oneup.services.   If to Client, notice shall  be sent  electronically to _____. Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement. Notice shall be deemed given on receipt or refusal, provided that notice sent by email shall be followed up by the sending Party with written notice sent in any other manner permitted under this Section 13(c), such written follow up notice to be received the next business day after the email notice.

(D)        Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

(E)        Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes ofenforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THEPARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

(F)        Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

**Client Initials                              .**

(G)      Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(H)      Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* principles.

(I)      Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

(J)      Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.

(K)      Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

(L)      Attorneys' Fees – If either party breaches this Agreement, or one party brings any action (including appeal) against the breaching party in connection with this Agreement, the prevailingparty in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees. For purposes of the foregoing, (a) "prevailing party" means (i) in the case of the party initiating the enforcement of rights or remedies, that it recovered substantially all of its claims, and (ii) in the case of the party defendingagainst such enforcement, that it successfully defended substantially all of the claims made against it, and (b)if no party is a "prevailing party" within the meaning of the foregoing, then no party will be entitled to recoverits costs and expenses (including attorney's fees and disbursements) from any other Party.

(M)      Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($5,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

(N)      Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(O)      Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

(P)      Cure - If at any time Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify

**Client Initials** _____.

ONE UP SERVICES, LLC © 2021

Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

(Q)     Indemnification –Each Party (as an "Indemnifying Party") agrees to indemnify, defend, and save and-hold harmless the other party, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) (collectively, the "Losses") which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Indemnifying Party's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any material breach of any representation, warranty, or covenant in this Agreement applicable to the Indemnifying Party and shall survive expiration or termination of this Agreement. Notwithstanding anything to the contrary in this Agreement, an Indemnifying Party is not obligated to indemnify, defend, and hold harmless Indemnified Parties against any claim (whether direct or indirect) if such claim or corresponding Losses arise out of or result from, in whole or in part, Indemnified Parties': (i) willful or gross negligence or more culpable act or omission (including reckless or willful misconduct); or (ii) bad faith failure to comply with any of its obligations set forth in this Agreement.

(R)     Survival – Any Section in this Agreement that requires survival, including, without limitation, sections 6, 9, 11, 12 and 13) shall survive the termination of this Agreement for the maximum period permitted by applicable law.

(S)     Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

(T)     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(U)     Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial

**Client Initials                       .**

Act, unless such claim arises from or results from, in whole or in part, Consultant's willful misconduct. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultantwould not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

**15. DEFINITIONS –** Words or phrases which are initially capitalized or are within quotation marks shall havethe meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

    **IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

    **CLIENT:**
By:_____
*authorized representative and agent for service of process*
Date: _____

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By:_____

Print Name:_____, individually

**ONE UP SERVICES, LLC**

By: _____
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*
Date: _____

**Client Initials            .**

ONE UP SERVICES, LLC © 2021

# EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

(A)    "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

(B)    "Confidential information" means information that one party may disclose or make available ("Disclosing Party") to the other party ("Receiving Party") about Disclosing Party's information that is not generally known to the public including without limitation proprietary business information, business affairs, products, services, confidential intellectual property, trade secrets, third- party confidential information and other sensitive or proprietary information, whether orally, or in written, electronic, or any other form or media, and whether or not marked, designated, or otherwise identified as "confidential." Confidential Information shall not include information, that  at the time of disclosure or afterwards becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Agreement by the Receiving Party or any of its representatives; (ii) is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (iii) was known by or in the possession of the Receiving Party or its representativesbefore being disclosed by or on behalf of the Disclosing Party; (iv) was or is independently developed by the Receiving Party without reference to or use, in whole or in part, of any of the Disclosing Party's Confidential Information; or (v) is required to be disclosed under applicable federal, state or local law, regulation, or a validorder issued by a court or governmental agency of competent jurisdiction.

(C) "Good Faith Efforts" means the action that a reasonable third-party would take in the samesituation or under the same circumstances.

(D) "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

(E)    "Pause" means the Store is inactive, and Consultant is unable to render its services to Client as provided under the Agreement.

(F)    The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

(G)    The term "Store" means the Client's wholly owned e-commerce location on the Walmart online platform where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

(H)    "Suspension" means an action or actions by Walmart which inactivates or freezes Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store.

**Client Initials                         .**

ONE UP SERVICES, LLC © 2021

# EXHIBIT B

## <u>TERMINATION OF ONE UP SERVICES AGREEMENT AND MUTUAL RELEASE</u>

This Termination Agreement ("Termination Agreement") is entered into as of the last date of execution below ("Effective Date") between One Up Services, LLC ("One Up") on the one hand, and JARED PRESLAR ("Jared Preslar") on the other hand (together, One Up and Jared Preslar  are the "Parties") as follows:

### RECITALS

A. Jared Preslar entered into an E-Commerce Consulting Agreement with One Up dated April 16, 2021 in connection with consulting services for a Walmart store ("Walmart Agreement").

B.	The Parties have agreed to terminate the Walmart Agreement and allow Jared Preslar to enter into a substantially similar Agreement with a 3rd party company of his choice and which would be deemed to have begun as of the commencement of the Walmart Agreement. One Up is agreeing to release Jared Preslar from the restrictive covenants in the underlying Walmart Agreement in exchange for the promises and consideration herein.

C.	The Parties agree that the non-disparagement and confidentiality clauses that Parties agreed to within the Walmart Agreement shall survive independent of this termination clause and the prevailing party in any dispute arising from a violation of said limited clauses shall be entitled to its reasonable attorney's fees and costs from the non-prevailing party.

D.	The Parties have agreed that it is in their mutual interest to resolve all of their differences under the terms set forth below.

E. The Parties agree that the Recitals herein shall be fully incorporated into this Agreement.

### TERMS

In consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed and covenanted by and between the Parties to this Agreement as follows:

**1. Monetary Payment.** The Parties agree that Jared Preslar's prior payment to One Up under the Walmart Agreement shall be retained by One Up.

**2. Releases.**

a.	Jared Preslar **release to One Up.** Immediately and automatically, without further notice or action by any of the Parties, Jared Preslar shall be deemed to have released and forever discharged One Up and its members, shareholders, principals, employees, officers, and directors from any and all debts, liabilities, obligations, promises, covenants, contracts, endorsements, bonds, controversies, legal actions, judgments, damages, expenses, claims and demands

whatsoever, in law or equity, known or unknown, which Jared Preslar had, now has, or may have, jointly, severally, in the alternative, for, or by any reasons of, any matter or cause whatsoever, relating to any services previously performed by One Up on behalf of Jared Preslar. The release in this paragraph shall not apply to a breach of this Termination Agreement.

**b.    One Up release to** Jared Preslar**.** Immediately and automatically, without further notice or action by any of the Parties, One Up shall be deemed to have released and forever discharged Jared Preslar and their members, shareholders, principals, employees, officers, and directors from any and all debts, liabilities, obligations, promises, covenants, contracts, endorsements, bonds, controversies, legal actions, judgments, damages, expenses, claims and demands whatsoever, in law or equity, known or unknown, which One Up had, now has, or may have, jointly, severally, in the alternative, for, or by any reasons of, any matter or cause whatsoever arising from acts, events, or circumstances occurring on or before the Effective Date, relating to any services previously performed by One Up on behalf of Jared Preslar. The release in this paragraph shall not apply to a breach of this Termination Agreement.

**3. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and to their respective successors and predecessors.

**4. Entire Agreement.** This Agreement represents the entire agreement between the Parties with regard to the subject matters discussed herein and supersedes all prior negotiations, representations or agreements between the parties, either written or oral. The parties are not relying on any statements or promises other than those made in this Agreement.

The Parties have executed this Agreement on the last date written as follows:

**One Up Services, LLC**

By: _____    Date: ___10/19/2021___
    *Michael J. Walding Jr.*
    8B79BCBE4FF04FD...
    Michael Walding

Jared Preslar

By: _____    Date: ___10/19/2021___
    *Jared Preslar*
    8A53B9F533864E5...
    Jared Preslar

DocuSign Envelope ID: CA529079-3A80-412F-9EC7-1DEE8AF3584A

## E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of ___October___ __24__, 2021, by and between NXTLVL SERVICES, LLC, a Florida limited liability company, whose address is 4300 Biscayne Blvd., Miami, Florida 33137 (hereinafter "Consultant"), and _Jared Preslar_____, whose address is _1741 west 925 south_____ (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Amazon platform (the "Store"):

1.  **CONSULTANT'S SERVICES** - Consultant agrees to perform the following services ("Services"):
    (A)      Maintain Client's Store, including configuring the Amazon storefront and configuring the front and back end systems necessary to manage the Store.
    (B)      Review, research, source, select, and list products for the Client's Store.
    (C)      Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
    (D)      Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

2.  **CLIENT RESPONSIBILITIES.**
    (A)      Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement. Client must cooperate on a reasonable and timely basis with respect to Consultant's role in configuring Client's Amazon store.
    (B)      Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a *minimum* credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon account or Store in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.
    (C) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this

**Client Initials**  _____.

NXTLVL SERVICES, LLC © 2021

DocuSign Envelope ID: CA529079-3A80-442F-9EC7-1DEE8AF3584A

Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

**3.   COMPENSATION**. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of zero dollars ($0.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. **The fee is nonrefundable**.

(A) Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant three hundred dollars ($300.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater.  Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).

(B) Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

**4.   TERM** – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

**5.   TERMINATION** – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time.  For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

**6.   NON-DISPARAGEMENT** – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, defame, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to blogs or social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

**7.   SALES / USE TAX** – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

**8.   INTELLECTUAL PROPERTY** – Client understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Amazon, and Consultant holds no legal or equitable rights in Client's Store.

**9.   RESTRICTED ACTIVITIES** – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties.  Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce,



**Client Initials** _____.

E-Commerce Consulting Agreement
Page 2 of 10

and throughout the United States. Therefore, Client agrees that *the following restrictions on Client's activities* are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration:

(A) Non-Competition. Client on behalf of itself and  its directors, officers, members or shareholders, employees, agents, and representatives agrees and warrants that during the Term of this  Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"),  Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that competes with Consultant and manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether  Client is physically located within the United States or outside of the United States.

(B) Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of  Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its  employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

(C) Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."

(i)      Notwithstanding the foregoing, Receiving Party will: 1)  promptly      notify      the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.

(ii)      If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

(D) Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information.  Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

(E) Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; *provided*, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

(F)  In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9.  Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States).



DocuSign Envelope ID: CA529079-3A80-442F-9FC7-1DEF8AF3584A

Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

**10. REPLACEMENT STORE.**  If Client's Store is suspended by Amazon for any reason, Consultant and Client agree to create a Replacement Store for Client for the remainder of the Agreement. Consultant shall continue to consult with Client for the Replacement Store consistent with the terms of this Agreement. Client must timely respond to all inquiries and requests for information from Consultant when creating a Replacement Store. If Client provides all information required by Amazon and Consultant to create a Replacement Store within 30 days of the original store suspension, Consultant will incur all startup costs for the Replacement Store and Consultant will not charge Client any monthly fees otherwise due hereunder until the month that the Replacement Store is profitable.

**11. LIMITATION OF LIABILITY**

(A) UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE,  SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILTY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

(B) CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).

(C) AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD.  AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

**12.   DISCLAIMERS AND RELEASE**

CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY



**Client Initials** _____.

DocuSign Envelope ID: CA529079-3A89-442F-9EC7-1DEE8AF3584A

THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3)  that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon and/or Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with  the marketability of Client's Store or its products;, including store suspensions (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant.  Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.

Amazon Terms and Conditions – Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon to remedy the situation at no extra cost. Consultant makes no



**Client Initials** _____.

NXTLVL SERVICES, LLC © 2021

DocuSign Envelope ID: CA529079-3A80-412F-9EC7-1DEE8AF3584A

representations or warranties of any kind, however, that Amazon will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Store in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies.

## 13. GENERAL PROVISIONS

Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to help@nxtlvlservices.com with a copy sent to cs@nxtlvlservices.com. If to Client, notice shall be sent electronically to _____Tebori1@gmail.com_____. Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to the Attorneys' Fees provision in this Agreement. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

**Client Initials**  .

NXTLVL SERVICES, LLC © 2021

Amendment.  This Agreement cannot be amended except in writing and signed by both Parties.

Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under *forum non conveniens* or other principles.

Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.

Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

Attorneys' Fees – If either party breaches this Agreement, or one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.

Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter.  The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the

**Client Initials**  _____.

NXTLVL SERVICES, LLC © 2021

parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party, which cannot be unreasonably withheld. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to  Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii)  give any other third-party access to Client Data except as necessary for  such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF

**Client Initials**  .

LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act.  In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act.  The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

**14. DEFINITIONS –** Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

**IN WITNESS WHEREOF,** this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: _____
*authorized representative and agent for service of process*

Date: _____
10/14/2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

By: _____
8A53B9F533864E5...

Print Name: _____, individually
Jared Preslar

**NXTLVL SERVICES, LLC**

By: _____
Michael J. Walding, Jr., CEO, *authorized representative and agent for service of process*

Date: _____
10/14/2021

DocuSign Envelope ID: CA529079-3A80-442F-9EC7-1DEF8AF3584A

# EXHIBIT A

**Definitions:** Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

a.   "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

b.   "Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure.

c.   "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store *after* deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

d.   "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

e.   The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

f.   The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

g.   "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.

**h.**   "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.

**Client Initials** 

NXTLVL SERVICES, LLC © 2021

# EXHIBIT 2

Paul R. Smith (14325)
Elena T. Vetter (17337)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801-536-6130
Fax: 801-536-6100
psmith@parsonsbehle.com
evetter@parsonsbehle.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JARED PRESLAR, an individual;<br><br>    Plaintiff,<br> vs.<br><br>NXTLVL SERVICES, LLC, a Florida Limited Liability Company, and ONE UP SERVICES, LLC, a Florida Liability Company;<br><br>    Defendants. | **DECLARATION OF PAUL R. SMITH IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**<br><br>Civil No. 1:23-cv-00078<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

I, Paul R. Smith, hereby declare and affirm as follows:

1. I am an individual over eighteen years of age capable of making this declaration. The facts stated herein are within my personal knowledge or based on my review of the attached documents and are true and correct.

2. I am an attorney at law licensed in good standing in the State of Utah, and a shareholder of the law firm Parsons Behle & Latimer.

3. I represent Plaintiff Jared Preslar.

4.   I have attached as Exhibit A hereto is a true and correct detail of the actual time spent by Parsons Behle timekeepers on this matter. Parsons Behle timekeepers kept and maintained these records contemporaneously in the ordinary course of business.

5.   In addition to myself, the other timekeepers on this matter are Elena T. Vetter, an associate attorney at Parsons Behle, licensed in good standing in the State of Utah, and Aaron Muranaka, a research librarian employed by Parsons Behle.

6.   The rate charged for my time working on this matter in the year 2022 was $365 per hour and for any work performed thereafter was $395 per hour. The rate charged for Ms. Vetter's time working on this matter in 2022 was $310 per hour; from January 1, 2023 through October 1, 2023 was $335 per hour; and for any work performed after October 1, 2023 was $355 per hour, until January 1, 2024, at which point her billable rate became $390 per hour. Mr. Muranaka's time was billed at $210 per hour in 2022 and $225 in 2023.

7.   In total, Plaintiff Preslar incurred $15,022 in legal fees, representing 44.7 hours' worth of work between the three timekeepers.

8.   The rates charged by myself, Ms. Vetter, and Mr. Muranaka are reasonable.

9.   The total amount of attorney fees expended on this response are reasonable and well within market rates.

10.  I hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: March 18, 2024

PARSONS BEHLE & LATIMER

  /s/ *Paul R. Smith*
Paul R. Smith

2

# EXHIBIT A

# Time Report

**Jared Preslar / NXTLVL Services, LLC and OneUp Services, (34016-001)**    02/23/2024

| Date | SM/Task | Attorney | Name | Staff Level | Description | Rate | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Rev Rate | Service | Activity | Invoice | Status |
|------|---------|----------|------|-------------|-------------|------|----------|----------|-----------|---------|---------|----------|---------|----------|---------|--------|
| 06/15/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 0 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10000 | | 1457411 | Billed |
| (Preslar) Confer with Paul Smith regarding returned letter; research NXTLVL registered agent; prepare second draft of letter to be sent out. | | | | | | | | | | | | | | | | |
| 09/05/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 0 | 0.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10000 | | 1457411 | Billed |
| (Preslar) Review letters and correspondence; confer with Paul Smith regarding drafting complaint. | | | | | | | | | | | | | | | | |
| 09/21/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 0 | 1.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10000 | | 1457411 | Billed |
| (Preslar) Draft Preslar complaint. | | | | | | | | | | | | | | | | |
| 09/27/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 0 | 2.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10000 | | 1457411 | Billed |
| (Preslar) Draft Preslar complaint. | | | | | | | | | | | | | | | | |
| 09/29/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 2.80 | 868.00 | 310.00 | 2.80 | 868.00 | 310.00 | 10000 | | 1457411 | Billed |
| (Preslar) Draft Preslar complaint. | | | | | | | | | | | | | | | | |
| 10/03/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 1.70 | 527.00 | 310.00 | 1.70 | 527.00 | 310.00 | 10000 | | 1449708 | Billed |
| Revise draft complaint; confer with Paul Smith regarding same. | | | | | | | | | | | | | | | | |
| 10/04/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 248.00 | 310.00 | 0.80 | 248.00 | 310.00 | 10000 | | 1449708 | Billed |
| Research and review for complaint. | | | | | | | | | | | | | | | | |
| 10/06/2022 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 3.50 | 1,277.50 | 365.00 | 3.50 | 1,277.50 | 365.00 | 10000 | | 1449708 | Billed |
| Review and revise complaint; communications with Elena Vetter regarding the same. | | | | | | | | | | | | | | | | |
| 10/06/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 248.00 | 310.00 | 0.80 | 248.00 | 310.00 | 10000 | | 1449708 | Billed |
| (Preslar) Finalize draft complaint; correspond with Paul Smith regarding same. | | | | | | | | | | | | | | | | |
| 10/07/2022 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.80 | 292.00 | 365.00 | 0.80 | 292.00 | 365.00 | 10000 | | 1449708 | Billed |
| Communications with client and Elena Vetter regarding complaint; revise complaint. | | | | | | | | | | | | | | | | |
| 10/07/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 248.00 | 310.00 | 0.80 | 248.00 | 310.00 | 10000 | | 1449708 | Billed |
| Confer with Paul Smith regarding edits to Complaint; make same; correspondence regarding same. | | | | | | | | | | | | | | | | |
| 10/10/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.40 | 124.00 | 310.00 | 0.40 | 124.00 | 310.00 | 10000 | | 1449708 | Billed |
| Updates to complaint; review and research regarding same. | | | | | | | | | | | | | | | | |
| 10/13/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.60 | 186.00 | 310.00 | 0.60 | 186.00 | 310.00 | 10000 | | 1449708 | Billed |
| Correspondence regarding LLC membership and WayBack machine checks. | | | | | | | | | | | | | | | | |
| 10/13/2022 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 0.40 | 84.00 | 210.00 | 0.40 | 84.00 | 210.00 | 10000 | | 1449708 | Billed |
| Research and analyze corporate officers of NXTLVL Services LLC and One Up Services, LLC and research state of residence of same per request of Elena Vetter. | | | | | | | | | | | | | | | | |
| 10/20/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 62.00 | 310.00 | 0.20 | 62.00 | 310.00 | 10000 | | 1449708 | Billed |
| Confer with Paul Smith regarding additional research for complaint. | | | | | | | | | | | | | | | | |
| 11/16/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.30 | 93.00 | 310.00 | 0.30 | 93.00 | 310.00 | 10000 | | 1457411 | Billed |
| Attention to complaint updates; confer with Aaron Muranaka regarding same. | | | | | | | | | | | | | | | | |
| 11/21/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 248.00 | 310.00 | 0.80 | 248.00 | 310.00 | 10000 | | 1457411 | Billed |
| Use WayBack Machine for use in complaint allegations. | | | | | | | | | | | | | | | | |
| 12/06/2022 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.20 | 73.00 | 365.00 | 0.20 | 73.00 | 365.00 | 10000 | | 1463976 | Billed |
| Communications with Eleva Vetter Complaint. | | | | | | | | | | | | | | | | |
| 12/06/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 62.00 | 310.00 | 0.20 | 62.00 | 310.00 | 10000 | | 1463976 | |

# Time Report

**Billed and Unbilled**

**Jared Preslar / NXTLVL Services, LLC and OneUp Services, (34016-001)**    02/23/2024

| Date | SM/Task | Attorney | Name | Staff Level | Description | Rate | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Rev Rate | Service | Activity | Invoice | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Confer with Paul Smith regarding updates to complaint. | | | | | | | | | | | | | |
| 12/12/2022 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.30 | 109.50 | 365.00 | 0.30 | 109.50 | 365.00 | 10000 | | 1463976 | Billed |
| | | | Communications with Elena Vetter regarding Complaint. | | | | | | | | | | | | | |
| 12/12/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 248.00 | 310.00 | 0.80 | 248.00 | 310.00 | 10000 | | 1463976 | Billed |
| | | | Research and draft Lanham Act analysis; correspondence regarding same. | | | | | | | | | | | | | |
| 12/20/2022 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.60 | 186.00 | 310.00 | 0.60 | 186.00 | 310.00 | 10000 | | 1463976 | Billed |
| | | | Update complaint with Wayback Machine website text; final read; correspond with Paul Smith regarding same. | | | | | | | | | | | | | |
| 01/19/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1475427 | Billed |
| | | | Correspond with Paul Smith regarding complaint updates. | | | | | | | | | | | | | |
| 01/26/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.60 | 201.00 | 335.00 | 0.60 | 201.00 | 335.00 | 10000 | | 1475427 | Billed |
| | | | Review client comments and edit complaint; correspond with Paul Smith regarding same. | | | | | | | | | | | | | |
| 01/29/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1475427 | Billed |
| | | | Client correspondence regarding complaint. | | | | | | | | | | | | | |
| 03/06/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 67.00 | 335.00 | 0.20 | 67.00 | 335.00 | 10000 | | 1489547 | Billed |
| | | | Confer with Paul Smith regarding Preslar complaint; communications with client regarding call. | | | | | | | | | | | | | |
| 03/07/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 67.00 | 335.00 | 0.20 | 67.00 | 335.00 | 10000 | | 1489547 | Billed |
| | | | Follow up regarding complaint conversation. | | | | | | | | | | | | | |
| 03/14/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.50 | 197.50 | 395.00 | 0.50 | 197.50 | 395.00 | 10000 | | 1489547 | Billed |
| | | | Communications with client and Elena Vetter regarding draft Complaint. | | | | | | | | | | | | | |
| 03/14/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 1.30 | 435.50 | 335.00 | 1.30 | 435.50 | 335.00 | 10000 | | 1489547 | Billed |
| | | | Call with Jared Preslar; confer with Paul Smith regarding same; review new materials sent by Jared. | | | | | | | | | | | | | |
| 05/02/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 2.50 | 987.50 | 395.00 | 2.50 | 987.50 | 395.00 | 10000 | | 1508157 | Billed |
| | | | Review and revise Complaint; research regarding tortious interference; communications with Elena Vetter. | | | | | | | | | | | | | |
| 05/02/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 1.40 | 469.00 | 335.00 | 1.40 | 469.00 | 335.00 | 10000 | | 1508157 | Billed |
| | | | Updates to Complaint; confer with Paul Smith regarding same; circulate same. | | | | | | | | | | | | | |
| 05/15/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1508157 | Billed |
| | | | Confer with Paul Smith regarding updates to Preslar complaint. | | | | | | | | | | | | | |
| 05/16/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.70 | 276.50 | 395.00 | 0.70 | 276.50 | 395.00 | 10000 | | 1508157 | Billed |
| | | | Communications with client; communications with Elena Vetter regarding Complaint. | | | | | | | | | | | | | |
| 05/16/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.40 | 134.00 | 335.00 | 0.40 | 134.00 | 335.00 | 10000 | | 1508157 | Billed |
| | | | Review correspondence from Jared; confer with Paul Smith regarding same; review edits to complaint. | | | | | | | | | | | | | |
| 05/17/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.30 | 100.50 | 335.00 | 0.30 | 100.50 | 335.00 | 10000 | | 1508157 | Billed |
| | | | Updates to Preslar complaint. | | | | | | | | | | | | | |
| 05/19/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.80 | 316.00 | 395.00 | 0.80 | 316.00 | 395.00 | 10000 | | 1508157 | Billed |
| | | | Review Complaint; communications with Elena Vetter regarding the same. | | | | | | | | | | | | | |
| 05/25/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1508157 | Billed |

# Time Report

**Jared Preslar / NXTLVL Services, LLC and OneUp Services, (34016-001)**                                                                                                02/23/2024

| Date | SM/Task | Attorney | Name | Staff Level | Description | Rate | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Rev Rate | Service | Activity | Invoice | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Client correspondence. | | | | | | | | | | | | | |
| 05/31/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1508157 | Billed |
| | | | Strategy discussion with Paul Smith. | | | | | | | | | | | | | |
| 06/06/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1511952 | Billed |
| | | | Correspondence regarding complaint. | | | | | | | | | | | | | |
| 06/14/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 67.00 | 335.00 | 0.20 | 67.00 | 335.00 | 10000 | | 1511952 | Billed |
| | | | Client correspondence. | | | | | | | | | | | | | |
| 06/26/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1511952 | Billed |
| | | | Assist with filing complaint. | | | | | | | | | | | | | |
| 06/26/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 0.80 | 180.00 | 225.00 | 0.80 | 180.00 | 225.00 | 10000 | | 1511952 | Billed |
| | | | Research corporate registrations and addresses for NXTLVL Services, LLC and OneUp Services and address for Michael Walding Jr. for purposes of service per request of Rhonda Kelley. | | | | | | | | | | | | | |
| 06/27/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.50 | 197.50 | 395.00 | 0.50 | 197.50 | 395.00 | 10000 | | 1511952 | Billed |
| | | | Attention to service issues; communications with Elena Vetter regarding the same. | | | | | | | | | | | | | |
| 06/29/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1511952 | Billed |
| | | | Correspondence regarding service. | | | | | | | | | | | | | |
| 06/29/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 1.80 | 405.00 | 225.00 | 1.80 | 405.00 | 225.00 | 10000 | | 1511952 | Billed |
| | | | Research and analyze procedure to issue and serve summons on individual and corporate defendants residing in Florida; draft summary of same. | | | | | | | | | | | | | |
| 07/13/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 0.60 | 135.00 | 225.00 | 0.60 | 135.00 | 225.00 | 10000 | | 1519757 | Billed |
| | | | Research and analyze dockets of other cases filed against NXTLVL Services and OneUp Services; draft summary of same. | | | | | | | | | | | | | |
| 07/21/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 1.00 | 225.00 | 225.00 | 1.00 | 225.00 | 225.00 | 10000 | | 1519757 | Billed |
| | | | Research and analyze federal, Florida, and Utah law regarding service on dissolved corporation per request of Elena Vetter; draft summary of same. | | | | | | | | | | | | | |
| 07/25/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1519757 | Billed |
| | | | Assist with coordinating service. | | | | | | | | | | | | | |
| 07/26/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 67.00 | 335.00 | 0.20 | 67.00 | 335.00 | 10000 | | 1519757 | Billed |
| | | | Coordinate service. | | | | | | | | | | | | | |
| 07/26/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 0.20 | 45.00 | 225.00 | 0.20 | 45.00 | 225.00 | 10000 | | 1519757 | Billed |
| | | | Correspond with Elena Vetter and Rhonda Kelly regarding service of complaint on dissolved Florida Corporation. | | | | | | | | | | | | | |
| 08/03/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.50 | 197.50 | 395.00 | 0.50 | 197.50 | 395.00 | 10000 | | 1527229 | Billed |
| | | | Communications with E. Vetter regarding proofs of service; review affidavit of service. | | | | | | | | | | | | | |
| 08/03/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 67.00 | 335.00 | 0.20 | 67.00 | 335.00 | 10000 | | 1527229 | Billed |
| | | | Coordinate filing proof of service. | | | | | | | | | | | | | |
| 09/25/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 67.00 | 335.00 | 0.20 | 67.00 | 335.00 | 10000 | | 1534980 | Billed |
| | | | Review docket text entry; correspondence with Paul Smith regarding same. | | | | | | | | | | | | | |
| 09/26/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 33.50 | 335.00 | 0.10 | 33.50 | 335.00 | 10000 | | 1534980 | Billed |
| | | | Client correspondence. | | | | | | | | | | | | | |
| 10/05/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 284.00 | 355.00 | 0.80 | 284.00 | 355.00 | 10000 | | 1542956 | Billed |

# Time Report

**Billed and Unbilled**

**Jared Preslar / NXTLVL Services, LLC and OneUp Services, (34016-001)**    02/23/2024

| Date | SM/Task | Attorney | Name | Staff Level | Description | Rate | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Rev Rate | Service | Activity | Invoice | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Draft and file status report; research default motion procedures. | | | | | | | | | | | | | |
| 10/06/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.40 | 142.00 | 355.00 | 0.40 | 142.00 | 355.00 | 10000 | | 1542956 | Billed |
| | | | Analyze process to obtain default; confer with Paul Smith regarding same. | | | | | | | | | | | | | |
| 10/10/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 284.00 | 355.00 | 0.80 | 284.00 | 355.00 | 10000 | | 1542956 | Billed |
| | | | Research regarding available damages for motion for default. | | | | | | | | | | | | | |
| 10/11/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 284.00 | 355.00 | 0.80 | 284.00 | 355.00 | 10000 | | 1542956 | Billed |
| | | | Draft motion for default. | | | | | | | | | | | | | |
| 10/13/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 35.50 | 355.00 | 0.10 | 35.50 | 355.00 | 10000 | | 1542956 | Billed |
| | | | Correspond with research librarian regarding research project. | | | | | | | | | | | | | |
| 10/13/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 0.30 | 67.50 | 225.00 | 0.30 | 67.50 | 225.00 | 10000 | | 1542956 | Billed |
| | | | Research jury instructions in case involving false advertising under the Lanham Act per request of Elena Vetter. | | | | | | | | | | | | | |
| 10/16/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.50 | 197.50 | 395.00 | 0.50 | 197.50 | 395.00 | 10000 | | 1542956 | Billed |
| | | | Communications with E. Vetter regarding default documents. | | | | | | | | | | | | | |
| 10/16/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 1.10 | 390.50 | 355.00 | 1.10 | 390.50 | 355.00 | 10000 | | 1542956 | Billed |
| | | | Client correspondence; draft default documents; confer with Paul Smith regarding same. | | | | | | | | | | | | | |
| 10/20/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.10 | 39.50 | 395.00 | 0.10 | 39.50 | 395.00 | 10000 | | 1542956 | Billed |
| | | | Communications with client. | | | | | | | | | | | | | |
| 11/01/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 35.50 | 355.00 | 0.10 | 35.50 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Check on default status. | | | | | | | | | | | | | |
| 11/13/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.70 | 276.50 | 395.00 | 0.70 | 276.50 | 395.00 | 10000 | | 1550934 | Billed |
| | | | Call with client regarding collection strategies; communications with E. Vetter regarding default judgment. | | | | | | | | | | | | | |
| 11/13/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.30 | 106.50 | 355.00 | 0.30 | 106.50 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Review order from court; confer with Paul Smith regarding same. | | | | | | | | | | | | | |
| 11/14/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 71.00 | 355.00 | 0.20 | 71.00 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Confer with Paul Smith regarding next steps; correspondence regarding collections expert. | | | | | | | | | | | | | |
| 11/20/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 284.00 | 355.00 | 0.80 | 284.00 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Review jury instructions; confer with Paul Smith regarding damages question; review local rules; correspondence with research librarian regarding research question. | | | | | | | | | | | | | |
| 11/22/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.40 | 142.00 | 355.00 | 0.40 | 142.00 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Review research conducted by research librarian. | | | | | | | | | | | | | |
| 11/22/2023 | 8417 | | Muranaka, Aaron | 200 | Paralegal | 1 | 2.50 | 562.50 | 225.00 | 0.00 | 0.00 | 0.00 | 10000 | | 1550934 | Billed |
| | | | Research and analyze availability and calculation of Lanham Act damages in case where default judgment has been entered per request of Elena Vetter; draft memorandum regarding same. | | | | | | | | | | | | | |
| 11/25/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 35.50 | 355.00 | 0.10 | 35.50 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Prepare correspondence to Paul Smith to be sent Monday regarding damages available under the Lanham Act. | | | | | | | | | | | | | |
| 11/28/2023 | 0378 | | Smith, Paul R. | 100 | Shareholder | 1 | 0.80 | 316.00 | 395.00 | 0.80 | 316.00 | 395.00 | 10000 | | 1550934 | Billed |
| | | | Review research memorandum; communications with E. Vetter regarding the same. | | | | | | | | | | | | | |
| 11/29/2023 | 0937 | | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 35.50 | 355.00 | 0.10 | 35.50 | 355.00 | 10000 | | 1550934 | Billed |

# Time Report

**Billed and Unbilled**

**Jared Preslar / NXTLVL Services, LLC and OneUp Services, (34016-001)**

02/23/2024

| Date | SM/Task | Attorney | Name | Staff Level | Description | Rate | Orig Hrs | Orig Amt | Orig Rate | Rev Hrs | Rev Amt | Rev Rate | Service | Activity | Invoice | Status |
|------|---------|----------|------|-------------|-------------|------|----------|----------|-----------|---------|---------|----------|---------|----------|---------|--------|
| | | | Correspondence with research librarian regarding research. | | | | | | | | | | | | | |
| 11/30/2023 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 35.50 | 355.00 | 0.10 | 35.50 | 355.00 | 10000 | | 1550934 | Billed |
| | | | Correspondence with research librarian. | | | | | | | | | | | | | |
| 11/30/2023 | | 8417 | Muranaka, Aaron | 200 | Paralegal | 1 | 2.50 | 562.50 | 225.00 | 0.00 | 0.00 | 0.00 | 10000 | | 1550934 | Billed |
| | | | Research and analyze Utah and 10th circuit case law regarding availability of attorney's fees where default judgment is entered in a Lanham Act case per request of Elena Vetter; draft memorandum regarding same. | | | | | | | | | | | | | |
| 12/01/2023 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 71.00 | 355.00 | 0.20 | 71.00 | 355.00 | 10000 | | 1564379 | Billed |
| | | | Correspondence with Paul Smith regarding potential damages. | | | | | | | | | | | | | |
| 12/06/2023 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 1.40 | 497.00 | 355.00 | 1.40 | 497.00 | 355.00 | 10000 | | 1564379 | Billed |
| | | | Draft default judgment paperwork and declaration; confer with Paul Smith regarding same. | | | | | | | | | | | | | |
| 12/22/2023 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.20 | 71.00 | 355.00 | 0.20 | 71.00 | 355.00 | 10000 | | 1564379 | Billed |
| | | | Revise client declaration; circulate same, and motion, to client for review. | | | | | | | | | | | | | |
| 01/16/2024 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.40 | 156.00 | 390.00 | 0.40 | 156.00 | 390.00 | 10000 | | 0 | Unbilled |
| | | | Communications regarding motion for default. | | | | | | | | | | | | | |
| 01/18/2024 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 39.00 | 390.00 | 0.10 | 39.00 | 390.00 | 10000 | | 0 | Unbilled |
| | | | Correspondence regarding client call. | | | | | | | | | | | | | |
| 01/23/2024 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.80 | 312.00 | 390.00 | 0.80 | 312.00 | 390.00 | 10000 | | 0 | Unbilled |
| | | | Prepare for and attend client call; communications regarding same. | | | | | | | | | | | | | |
| 02/05/2024 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.30 | 117.00 | 390.00 | 0.30 | 117.00 | 390.00 | 10000 | | 0 | Unbilled |
| | | | Update Preslar declaration; circulate to Paul Smith. | | | | | | | | | | | | | |
| 02/07/2024 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.60 | 234.00 | 390.00 | 0.60 | 234.00 | 390.00 | 10000 | | 0 | Unbilled |
| | | | Updates to Preslar declaration; communications with client regarding same. | | | | | | | | | | | | | |
| 02/09/2024 | | 0937 | Vetter, Elena T. | 150 | Associate | 1 | 0.10 | 39.00 | 390.00 | 0.10 | 39.00 | 390.00 | 10000 | | 0 | Unbilled |
| | | | Update to Preslar declaration. | | | | | | | | | | | | | |
| **Report Totals:** | | | | | | | **54.50** | **16,147.00** | | **44.70** | **15,022.00** | | | | | |